## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

LOKESH VUYYURU, M.D.,                )
and                                  )
VIRGINIA GASTROENTEROLOGY            )
ASSOCIATES PC                        )
and                                  )
VIRGINIA TIMES, INC.                 )
                                     )
           *Plaintiffs*              )
                                     )
v.                                   )        Civil Action No.  **3:10CV173**
                                     )
GOPINATH JADHAV, M.D.,               )
                                     )
and                                  )
                                     )
SOUTHSIDE GASTROENTEROLOGY           )
ASSOCIATES, Ltd.,                    )
                                     )
and                                  )
                                     )
PETERSBURG HOSPITAL, INC.            )
D/B/A SOUTHSIDE REGIONAL             )
MEDICAL CENTER                       )
                                     )
and                                  )
                                     )
COMMUNITY HEALTH SYSTEMS             )
PROFESSIONAL SERVICES, INC.          )
                                     )
and                                  )
                                     )
PETERSBURG HOSPITAL CO., LLC         )
                                     )
and                                  )
                                     )
THE CAMERON FOUNDATION               )
a Virginia Nonprofit Corporation     )
                                     )
and                                  )
                                     )
COLUMBIA/HCA JOHN RANDOLPH, INC.     )
                                     )

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA
2010 MAR 16  P 4: 58
FILED

and                                                    )
                                                       )
VIRGINIA BOARD OF MEDICINE,                            )
                                                       )
and                                                    )
                                                       )
ANANT DAMLE, M.D.                                      )
                                                       )
and                                                    )
                                                       )
JERRY KILGORE,                                         )
in former and official capacity                        )
and in individual capacity as                          )
VIRGINIA ATTORNEY GENERAL                              )
                                                       )
and                                                    )
                                                       )
Judith W.  Jadgman                                     )
In official capacity as acting                         )
VIRGINIA ATTORNEY GENERAL                              )
                                                       )
and                                                    )
                                                       )
DAVID DUNHAM                                           )
                                                       )
and                                                    )
                                                       )
DAVID FIKSE                                            )
                                                       )
and                                                    )
                                                       )
LINDA AULT                                             )
                                                       )
and                                                    )
                                                       )
FRANK W. PEDROTTY                                      )
                                                       )
and                                                    )
                                                       )
STEPHEN E. HERETICK                                    )
                                                       )
and                                                    )
WILLIAM HARP, MD                                       )
                                                       )
and                                                    )
                                                       )

ROBERT NEBIKER                              )
                                           )
and                                        )
                                           )
JOHN STANWIX                               )
                                           )
and                                        )
                                           )
LYNN AUSTIN                                )
                                           )
and                                        )
                                           )
KAMANESH DAVE, MD                          )
                                           )
and                                        )
                                           )
AKSHY DAVE, MD                             )
                                           )
and                                        )
                                           )
JOHN DOE DEFENDANTS 1 TO 10                )

## COMPLAINT

COMES NOW your plaintiff, DR. LOKESH VUYURRU, M.D., by counsel, and files this his Complaint against defendants JADHAV GOPINATH, M.D., SOUTHSIDE GASTROENTEROLOGY ASSOCIATES, LTD., PETERSBURG HOSPITAL, INC. d/b/a Southside Regional Medical Center (hereinafter referred to as "SRMC"), COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES, INC. (hereinafter "CHS"), the VIRGINIA BOARD OF MEDICINE, ANANT DAMLE, M.D., and the VIRGINIA ATTORNEY GENERAL and in support thereof, states as follows:

## JURISDICTION AND VENUE

1.      This court has subject matter jurisdiction over certain claims herein pursuant to 18 U.S.C. § 1964, 15 U.S.C. § 77v, 28 U.S.C. § 1331 and 29 U.S.C. §

3

1132(e) because they arise under the laws of the United States and over other claims

herein pursuant to supplemental jurisdiction under 28 U.S.C. § 1367. This Court has

personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), 15

U.S.C. § 77v, 15 U.S.C. § 78aa, and 18 U.S.C. § 1965.

## PARTIES

3.    DR. LOKESH VUYURRU is a renowned specialist in gastroenterology and

was a leading member of the American Gastroenterology Association. Dr. Vuyurru has

been licensed in India, Virginia, Illinois, New York and New Jersey. He is board certified

with the American Board of Internal Medicine in gastroenterology and internal medicine.

Dr. Vuyurru has practiced under fellowships with the National Institute of Health at VCU.

DR. VUYURRU has received numerous awards including two Glaxo Smith Kline impact

awards for his work in the field of gastroenterology. Dr. Vuyurru has also invented

surgical instruments and procedures in his field. Dr. Lokesh Vuyurru is also a

consultant in the field of hospital medicine and management.

4.    Defendant Dr. Gopinath Jadhav is a gastroenterologist residing at 9005

Springbrook Ct. in Henrico County,Virginia, 23229. He is the sole shareholder,

President and director of defendant Southside Gastroenterology Associates, Ltd.

(hereinafter "SGA"). Plaintiff Dr. Vuyurru has filed formal complaints against defendant

Jadhav for patient malpractice and medicare/medicaid/insurance fraud. According to

Dr. Vuyyuru, several incidents of malpractice on the part of physicians at Southside

Gastroenterology Associates resulted in very high morbidity and mortality among

patients. Plaintiff Dr. Vuyurru has testified as a witness for the State of Virginia in grand

4

jury proceedings against Dr. Jadhav.  Dr. Vuyyuru is a federal witness who received immunity from the federal Justice Department in 2003 in an investigation of SRMC, JRMC and physicians implicated in fraudulent practices.

5.      Defendant The Cameron Foundation, a Virginia non-profit corporation is the successor in interest to The Hospital Authority of the City of Petersburg, a political subdivision of the Commonwealth of Virginia which operated Southside Regional Medical Center until its sale on or about 2003 to defendant Petersburg Hospital Company, LLC ("PHC") a Virginia limited liability company, which has owned and operated Southside Regional Medical Center from that time until the present. Defendants Cameron Foundation as successor in interest and PHC are referred to herein as "SRMC" or "Southside Regional Medical Center".  Plaintiff Dr. Vuyurru has filed civil complaints as a relator under whistleblower laws against defendants.  Plaintiff Dr. Vuyurru has testified as a witness for the Virginia State in state grand jury proceedings against defendants.

6.      Columbia/HCA John Randolph, Inc. is a corporation and hospital located in Hopewell, Virginia (hereinafter JRMC).  Defendant JRMC was involved in medicaid/medicare and insurance fraud.

7.      Defendant Virginia Board of Medicine has administrative jurisdiction and responsibility for the investigation and adjudication of disputes relating to the licensure of physicians.  Decisions regarding the license of physicians can have an impact on the ability of a physician to practice in other states and jurisdictions.

8.      Defendant Damle provided the sole specialist testimony against Dr. Vuyurru on behalf of the Board.  Upon information and belief, Dr. Damle is from India as

5

defendant Dr. Jadhav and is an acquaintance, friend and/or family member of Dr. Jadhav.

9.    Defendant Virginia Attorney General acted as (1) presenter of the Board of Medicine's case and (2) counsel to the Board during its deliberations.  At all times alleged herein regarding actions of the Virginia Attorney General's office, the Attorney General knew that the office was the subject of federal and state grand jury proceedings related to an investigation in which plaintiff Dr. Vuyyuru was a witness.

10.    Defendant David Dunham was the former CEO of SRMC until June of 2003 and was involved in medicare, medicaid and other insurance fraud with physicians Gopinath Jadhav, Kamensh Dave, Akshy Dave, Daniel Threat, Eniola Adebayo Okelana and Raphael Agada.

11.    Defendant David Fikse is the successor to David Dunham and involved in Medicare, Medicaid and other insurance fraud.

12.    Linda Ault was the Vice President of JRMC and involved in Medicare, Medicaid and other insurance fraud and recordkeeping regarding Patients A and B (see Retaliation infra).

13.    Jerry Kilgore was the former Attorney General during state and federal investigations of Medicare, Medicaid and other insurance fraud.

14.    Judith W. Jagdman became acting Attorney General after the resignation of Jerry Kilgore.

15.    Frank W. Pedrotty was employed by the Attorney General's office and involved in the petition against Dr. Vuyurru in front of the Board of Medicine.

16. Stephen E. Heretick was the chairman of the Committee adjudicating the license revocation hearing of Dr. Vuyurru.

17. Dr. William Harp was a director of the Board of Medicine.

18. Robert Nebiker was director of Department of Health Professions and was directly involved in the investigation and prosecution of the license revocation proceedings against Dr. Vuyurru.

19. John Stanwix was the adjunct specialist and assistant to William Harp and Frank W. Pedrotty. John Stanwix was involved in the investigation against plaintiff Dr. Vuyurru.

20. Lynn Austin was an investigator against plaintiff Dr. Vuyurru.

21. Kamalesh Dave was a doctor at SRMC and JRMC involved in Medicare, Medicaid and other insurance fraud and patient malpractice.

22. Akshy Dave was a doctor at SRMC and JRMC involved in Medicare, Medicaid and other insurance fraud and patient malpractice.

23. John Doe Defendants 1 to 5 were involved in insurance fraud or patient malpractice or retaliation or received contributions or payments in exchange for official services.

## STATEMENT OF FACTS

### SUMMARY

24. From on or about 1997 to 2003, Plaintiff Dr. Vuyurru was a member of the department of medicine at Southside Regional Medical Center and from 1997 to 2005 at John Randolph Medical Center.

25.     Plaintiff Dr. Vuyurru became director of Gastroenterology at John Randolph Medical Center in 2001, and was assistant director of Gastroenterology at John Randolph Medical Center from on or about 2002 through 2005.

26.     Plaintiff Dr. Vuyurru was a member of the committee for Gastroenterology at Southside Regional Medical Center from on or about 1997 to 2003.

27.     From on or about 1997 to 2003, Plaintiff Dr. Vuyurru was the investigating committee member for peer review at Southside Regional Medical.

28.     Dr. Vuyyuru started a newspaper in June 2004 called Virginia Times to inform the public of fraud and corruption in the healthcare industry.

29.     From 1998 through 2006, Dr. Vuyyuru engaged in whistleblowing activities protected by federal and Virginia law, including disclosures to Southside Regional Medical Center (SRMC) and John Randolph Medicial Center (JRMC) hospital officials and federal and state law enforcement authorities of potential and apparent violations of federal and state laws.

30.     These violations of federal and state law included

    a.   Malpractice and negligent patient care resulting in injury and death.

    b.   Medicaid, medicare and insurance fraud resulting in unnecessary treatments and patient care injuries and deaths

31.     From 2000 to 2005, in retaliation of Dr. Vuyyuru's protected disclosures and duty to disclose malpractice, officials of these two hospitals initiated internal personnel actions against Dr. Vuyyuru and filed complaints with the Virginia Board of Medicine regarding Dr. Vuyyuru because of his complaints and disclosures regarding these hospitals and some staff members.

32.   In retaliation for The Virginia Times publication of fraud and misconduct protected by the First Amendment to the United States Constitution, defendants SRMC, JRMC and certain physicians unlawfully contacted and caused advertisers to cease business with the Virginia Times based on false and misleading information.

33.   On August 10, 2005, without prior notice to Dr. Vuyyuru or opportunity to be heard, the Board of Medicine convened with Assistants to the Attorney General of Virginia, serving as both prosecutor and counsel for the Board, together with various witnesses including investigators Twombly, Hardy and Austin from the Department of Health Professions, "received information" and suspended Dr. Vuyyuru's license, without providing any subsequent preliminary hearing.

## MEDICAL CARE FRAUD AND MISCONDUCT

34.   Defendants SRMC, JRMC, Community Health Systems Professionals and defendant physicians and associated staff engaged in illegal conduct including, but not limited to

a.   Health care fraud in billing for medical services, the provision of medical services, and compensation for medical services.

b.   Malpractice related to failure to follow standard protocol and procedures resulting in patient injuries and death.

35.   Some of the specific types of health care insurance fraud that defendants Dr. Jadhav, SRMC, John Randolph, Community Health Systems Professionals and associated staff and physicians engaged in include

a.   Billing for services that were never rendered and billing for more expensive services or procedures than were actually provided or performed ("upcoding").

b.   Performing medically unnecessary services solely for the purpose of generating insurance payments.

c.   Misrepresenting non-covered treatments as medically necessary.

d.   Falsifying a patient's diagnosis to justify tests, surgeries or other procedures that were not medically necessary.

e.   Accepting kickbacks for patient referrals.


36.   From 1997 to 1999, defendant Southside Regional Medical Center and administrative staff and/or physicians David Dunham, Sam Johnson, Gopinath Jadhav, Henry Ellett, Dona Fukomoto, Lin, Ming Chiu, Vijaya Chirumamilla, Yorckay Ishizawar, John Feminella, Robert Davis, and Frank Shea engaged in the following specific acts constituting fraud

a.   Formation of an independent private medical practice called Southside Physicians Limited started by ten physicians including doctors Gopinath Jadhav, Henry Ellett, Dona Fukomoto, Lin, Ming Chiu, Vijaya Chirumamilla, Yorckay Ishizawar, John Feminella, Robert Davis, and Frank Shea.

b.   The purpose of this enterprise was to have primary care physicians at SRMC to admit and refer patients exclusively to this group in exchange for payments to the primary care physicians (i.e. kickbacks).

10

c.    That said defendants and individuals did engage in such activity prior to
      the closure of the SPL.

37.    From 1997 to 2005, Dr. Vuyyuru, upon information and belief and based
on direct knowledge, found that at SRMC Dr. K. Dave engaged in a pattern of
unnecessary medical procedures including requiring invasive surgery involving cardiac
catheterizations including, but not limited to:

a.    Patient Jane Doe 1 (MR#9433) came to SRMC in 1997.  Jane Doe 1 had
      a cardiac catheter inserted despite the knowledge to a reasonable degree
      of medical certainty that this patient not candidate for a stent insertion.
      This misdiagnosis and failed procedure was confirmed when Jane Doe 1
      subsequently had to have a coronary bypass artery graft.

b.    Patient Jane Doe 1 was admitted with cellulitis of Lower extremities.  Dr.
      Dave inserted a cardiac catheter intentionally misdiagnosing the patient's
      problem as right heart failure.

c.    Patient John Doe 2 was admitted by plaintiff Dr. Vuyyuru with abdominal
      pain and constipation and examined by Dr. Shandilya at SRMC.  Dr.
      Shandilya requested consultation with Dr. Dave for uncontrolled
      hypertension when John Doe's blood pressure measured 124/71 mmHg,
      well within the normal range.  Consultation for constipation with Jadhav.
      This required John Doe to remain in the hospital much longer than
      necessary resulting in higher fees to SRMC and doctors based on
      insurance billing.

11

38.     In April, 2002, Jane Doe 3 came to SRMC complaining that he could not

walk and was feeling weak.  Dr. Threat of SRMC discharged Jane Doe 3 despite her

physical condition.  That same night, Jane Doe 3 returned and Dr. Agada filled out and

filed a form stating that he did a history and physical examination of the patient without

ever examining her.  Dr. Vuyurru later examined the patient confirming her medical

problems and the fact that neither doctor examined or treated Jane Doe 3 as required

by health rules and regulations.

39.     From October 1, 1997 to April 20, 2005, plaintiff observed malpractice and

billing fraud at SRMC and JRMC by defendant Dr. Gopinath Jadhav.  Plaintiff Dr.

Vuyyuru saw John Doe 4 in his office on May 7th, 2002. and scheduled him for

colonoscopy on May 10, 2002 at John Randolph Hospital, Hopewell.  Without proper

diagnosis or protocol, Dr. Jadhav not only performed a colonoscopy on the patient but

biopsied the colon (an invasive and unnecessary surgical procedure in this patient's

situation).  Other misconduct includes the following:

a.     Dr. Jadhav failed to explain the procedure to the patient.

b.     Dr. Jadhav faild to get the patient's consent.

c.     Dr. Jadhav discharged the patient without proper instructions

d.     Dr. Jadhav, himself, did not know the indications and proper diagnosis for
       the procedure.

e.     Dr. Jadhav did not conduct a history and physical examination of the
       patient but fraudulently filled the requisite form after the procedure was
       done.

12

f.     Nurse manager Terry Swindell tried to assist Dr. Jadhav in covering up of the fraudulent colonoscopy and false documentation once plaintiff Dr. Vuyyuru noted these violations of medical and administrative protocol.

g.     Dr. Jadhav threatened Dr. Vuyyuru with retaliation if plaintiff reported the case of John Doe 4 as is required under federal and state health regulations.

h.     Dr. Jadhav threatened Dr. Vuyyuru with retaliation on other occasions consisting of claims of malpractice and relating to his license. Said claims were not associated with any specific patients or cases.

40.     Plaintiff Dr. Vuyyuru observed a pattern of unnecessary medical procedures conducted by Dr. Jadhav as a practicing physician at SRMC and JRMC. Specifically, Dr. Jadhav performed colonoscopies routinely taking a biopsy of the Valvula Bauhini also known as Ileocecal Valve ("IC Valve") with a stated impression of lipoma (a benign disease) when he was unable to find a polyp (a malignant disease). The procedure was unnecessary. This practice continued through March 2005, and was reflected in medical records and also observed by medical staff including but not limited to nurses BetsyJernigan, Beverly Horton, Florence Challis and Donna Newmyer.

41.     Dr. Jadhav conspired with SRMC and JRMC to perform the unnecessary medical procedures with the purpose of charging Medicaid and Medicare as well as private insurance companies for the unnecessary medical procedure for the sole purpose of enhancing his income and that of SRMC and JRMC.

42.     That the acts of patient misconduct illustrated above are in addition to many such acts all of which constitute a pattern of conduct.

43.     That for the purpose of executing and/or attempting to execute the above described schemes to defraud or obtain money by means of false pretenses, representations or promises, these defendants and individuals, also in violation of 18 U.S.C. § 1341 and § 1343, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, transmitted and received by wire, matter and things which include but are not limited to agreements, correspondence, patient names, payments, reports, data, summaries, statements and plan materials.

## **RETALIATION AND MALICIOUS PROSECUTION**

44.     From 1998 through 2006, Dr. Vuyyuru engaged in whistleblowing activities protected by federal and Virginia law, including disclosures to Southside Regional Medical Center (SRMC) and John Randolph Medical Center (JRMC) hospital officials and federal and State law enforcement authorities of potential and apparent violations of federal and state laws.

45.     From 1998 to 2005, officials of these two hospitals, some of whose staff were the subject of Dr. Vuyyuru's complaints and disclosures to law enforcement, initiated internal personnel actions against Dr. Vuyyuru and filed complaints with the Virginia Board of Medicine.

46.     Among the filed complaints were formal complaints regarding articles published by Dr. Vuyyruru in the Virginia Times.

47.      Three or four of these complaints by SRMC and JRMC regarding Vuyyuru

were overtly the subject of the later license revocation hearing that began in November of 2005 by the Virginia Board of Medicine.

48.     Although relevant to the issue of motive, Dr. Vuyyuru was not allowed to introduce the complaint regarding the Virginia Times articles nor was the complaint mentioned by the Board or the Attorney General's office prior to or during the hearing.

49.     In June of 2004, Dr. Damle was employed by the Virginia Board of Medicine (Board) under a contract signed by Dr. Harp, Executive Director of the Board as the sole expert whose testimony was necessary to the decision to revoke Dr. Vuyyuru's license. The contract provided that Dr. Damle would serve as an investigator, a consultant, and an expert witness on behalf of the Board and the Attorney General's office in regard to an investigation and potential disciplinary actions regarding Dr. Vuyyuru. The contract provided that Dr. Damle would work under the direction of the Board and the Attorney General's office.

50.     Dr. Damle was not qualified to be an expert witness against Dr. Vuyurru because of his personal relationship with Dr. Jadhav, one of the principal perpetrators of fraud identified by Dr. Vuyyuru who had expressly threatened Dr. Vuyurru with retaliation.

51.     Damle was not qualified to be an expert witness against Dr. Vuyyuru because he lacked the requisite number of operations in the field to be considered an expert.

52.     During early-mid 2005, the Board and the Attorney General's office, via John Stanwix, who provided assistance to the Attorney General's prosecuting attorney, Mr. Frank Pedrotty, regarding the Vuyyuru license revocation proceeding, and via

investigator Ann Hardy, provided Dr. Damle with a materially incomplete set of records regarding the patients Dr. Vuyyuru was accused of treating improperly.  Of the six patients whose cases were relied on by the Board for the revocation of Dr. Vuryyuru's license (Patients A, B, D, E, I and K), there were demonstrable material omissions in the records provided to Dr. Damle regarding at least 5 of these 6 patients.

    a.      In regard to Patient A, this patient had two successive admissions to the hospital. Dr. Vuyyuru was the admitting doctor for the first visit of Patient A to the hospital. Patient A was released from the hospital in stable condition after this first visit. The patient was subsequently admitted again by another doctor.  Patient A's complications and ultimate death resulted from mistakes and potential misconduct by nurses, doctors, and persons other than Dr. Vuyyuru.   However, the records regarding Patient A's second admission were not provided to Dr. Damle until just prior to or during the revocation hearing and only after Dr. Damle had already formed an opinion and had issued a report to the Board regarding Patient A.  Dr. Vuyyuru would not have been responsible for Patient A's death and complications because Patient A was not his patient during the time in question.

    b.      In regard to patient B, critical information was discovered by Dr. Vuyyuru after his revocation hearing which shows that patient B almost died as a result of

        i)      an overdose of the medication that was used for sedation,

ii)     a failure to administer the antidote required to counter the sedative medications, and

iii)    a removal of emergency resuscitation equipment

Patient B would have died if not for the heroic efforts of Dr. Vuyyuru to resuscitate the patient while handicapped by the unexpected unavailability of the key emergency equipment on the cart and without having been told of the overdose of sedatives or the failure to provide the antidote.

The administration of anesthetic drugs was not the responsibility of Dr. Vuyurru.  The provision of key emergency equipment on a cart is per standard protocol and hospital regulation not requiring the direct order or inspection of a physician.  This material information, which Dr. Vuyyuru discovered after his license revocation hearing, had also not been provided to Dr. Damle.

c.      In addition, the patient records provided to Dr. Damle by the Board and the Attorney General's office were grossly incomplete with regard to other patients that were the subject of the complaint.

53.     In March, 2005, investigators for the Board began an investigation into the February 21, 2005 SRMC complaint regarding the articles in Dr. Vuyyuru's newspaper. Potential witnesses were interviewed and asked about Dr. Vuyyuru's newspaper and articles.

54.     On or about April 25, 2005, investigator Ann Hardy, acting for the Board of Medicine and the Virginia Attorney General's office, provided Dr. Damle with documents

17

and a verbal summary of the investigators' initial findings of their inquiry, including regarding the medical records of Patient A and Patient B.   This was done on the instruction of John Stanwix of the Attorney General's office.

55.     The communications between investigator Hardy and Dr. Damle occurred prior to Dr. Damle reviewing the medical records of these patients and prior to forming his own opinion based on these records.

56.     On or shortly after May 7, 2005, Dr. Damle submitted a report to the Board regarding Dr. Vuyyuru and the treatment of two patients, referred to here and in the Board's license revocation hearing as Patient A and Patient B based on incomplete information.

57.     In June of 2005, Board staff participated in a meeting with hospital officials and discussed among other complaints about Dr. Vuyyuru the intent of the hospital to file a defamation lawsuit against Dr. Vuyyuru because of his newspaper articles.

58.     On or shortly before June 22, 2005, Board staff member Twombly directed investigator Hardy to shred a set of records related to an investigation prompted by Dr. Vuyyuru related to improper use of peer review procedures by the hospitals.

59.     On July 25, 2005, Board investigators Hardy and Twombly initiated a search of Dr. Vuyyuru's office over the objection of Dr. Vuyyuru and without any warrant, subpoena, or court order.

60.     On August 1, 2005, John Stanwix, the assistant to the Attorney General's prosecuting Attorney Mr. Pedrotti, directed the Board's staff to delete from the administrative record any reference to the verbal report given to expert witness Damle by the Board's staff on April 25, 2005.   Board investigator Hardy expressed concerned

18

about this directive to delete this information from the administrative record and she asked John Stanwix why such a deletion was allowed, in both a telephone call and in a face-to-face meeting. Mr. Stanwix falsely stated to Ms. Hardy that such deletions were allowed as a legal part of the process.

61.     On August 10, 2005, the Board and Attorney General's office served on Dr. Vuyyuru notice of the suspension of his license, along with the purported administrative record supporting the Board's suspension decision.

62.     Dr. Vuyyuru determined later, after a review of the records provided and eventually getting a response from the hospital to his subpoena in another proceeding for the complete set of records, that the complete set of medical records for the patients at issue had not been provided.

63.     From August 10, 2005 through May of 2006 when the Board made its decision at the end of the revocation hearing, the Board and Attorney General's office withheld material evidence from Dr. Vuyyuru, including one of the most serious charges involving Patient B, depriving him of the opportunity to defend himself and his record.

64.     In particular, the Board failed to disclose to Dr. Vuyyuru the critical records which Dr. Vuyyuru subsequently discovered post-hearing on his own that show that patient B had been given (by someone other than Dr. Vuyyuru) an overdose of medication for sedation but had not been given the antidote to counteract the sedation medication.

65.     In November of 2005, the prosecuting attorney for the Attorney General's office, Mr. Pedrotty, was witnessed by Dr. Vuyyuru engaging in conduct that on its face appeared to constitute fraud on the tribunal when he instructed expert witness Damle

during the break in the proceedings of the revocation hearing that Damle should not alter his testimony after going into the witness room to review 1974 pages of patient records.

66.     Damle had been instructed by the Board hearing panel chair, attorney Heretick, to review these records and then be subject to examination regarding whether his opinion had changed.   This instruction from the Board Chair resulted from the fact that during the cross examination of Dr. Damle by Dr. Vuyyuru's attorney, it became evident that the Board and the Attorney General's office had failed to provide the bulk of the medical records relating to patients E through L to Dr. Damle prior to the revocation hearing, and prior to Dr. Damle forming his opinion regarding the treatment of these patients.

67.     Rather than disqualifying Dr. Damle or discounting his opinions, the chair of the Board hearing panel directed Dr. Damle to retire to another room to review the complete set of records provided by Dr. Vuyyuru's attorney, Mr. Thomas Roberts.

68.     Consequently, Deputy Attorney General Pedrotti's direction to Dr. Damle, given outside of the presence of the Board and intended to be outside of the presence of Dr. Vuyyuru, to the effect that Dr. Damle should not change his testimony after reviewing the complete records, corrupted the judicial process and defeated the purpose of the Chairman's instruction to Dr. Damle.

69.     In February of 2006, the Board held the second session of Vuyyuru's license revocation hearing.

70.     On May 18, 2006, Dr. Harp, the executive director of the Board was permitted to participate in the Board committee's deliberations and decision making on

the revocation of Dr. Vuyyuru's license, notwithstanding the objection of Dr. Vuyyuru's lawyer. Dr. Harp was allowed to participate in the Board's decision on the revocation despite the fact he had a conflict of interest or bias and because he had previously received *ex parte* material information.

71. Dr. Harp was biased and had a conflict because articles in Dr. Vuyyuru's newspaper, the Virginia Times, had criticized Dr. Harp by name and Dr. Harp was observed to have been upset with these articles at the time of publication.

72. In contrast to Dr. Harp, Dr. Leecost, who was apparently perceived by the Board or Attorney General's office as sympathetic to Dr. Vuyyuru, was required by the Board or the Attorney General's office to recuse himself and was not allowed to participate in the Vuyyuru license revocation hearing, deliberations and decision.

73. On May 18, 2006, after private executive session deliberations the same day, the Board issued its decision revoking Dr. Vuyyuru's license and read into the record 8 pages of detailed findings of fact and conclusions of law allegedly supporting this decision. This decision was reflected in an Order from the Board on May 19, 2006.

74. As a result of defendant SRMC and associated doctors' campaign to deprive the Virginia Times of advertising revenue, the paper was forced to shut down costing plaintiff Virginia Times one million ($1 million).

75. The decision by the Board is noteworthy, and suspect, in several respects, including:

a) The Board had brought charges against Dr. Vuyrru regarding at least 22 patients, but the final decision asserted violations of the standard of care by Dr. Vuyyuru regarding only six patients. It is apparent from this fact that

21

the Board was aggressively pursuing charges against Dr. Vuyyuru regardless of their merit.   In contrast, Dr. Vuyyuru brought complaints regarding a number of doctors for well documented misconduct which the Board never pursued.   This reflects disparate treatment and is evidence of malicious prosecution.

b)   The Board discounted or disqualified some of Dr. Vuyyuru's eminent nationally respected experts because they had not reviewed all of the medical records of the patients at issue.   However, when the same situation arose with Dr. Damle, the only expert to come to a conclusion adverse to Dr. Vuyyuru, the Board allowed Dr. Damle a special opportunity to rehabilitate his uninformed opinion by taking 2.5 hours in the middle of his cross examination at the revocation hearing to review the 1974 pages of patients' records that the Attorney General's office and the Board had failed to provide him to review before forming his initial opinions. To review all of the records would have required that Dr. Damle read and evaluate over 789 pages of medical records per hour.

c)   The Attorney General's office and the Board discounted or disqualified some of Dr. Vuyyuru's expert witnesses because they had been given and in part based their opinions on summaries of patient information that had been provided by Dr. Vuyyuru and his counsel.   Had this same standard been applied to the Damle, the Board's expert, he too would have been

subject to having his opinion discounted for the same reason that the Board discounted one or more of Dr. Vuyyuru's experts.

d)      The Attorney General's office and the Board discounted or disqualified some of Dr. Vuyyuru's expert witnesses for not knowing the "Virginia standard of care," even though the relevant standard of care is a national standard that is no different in Virginia than in the states in which these experts practice and is specifically allowed under the laws of Virginia.   Va. Code § 8.01-581.20.

e)      The Board found Dr. Vuyyuru responsible for Patient A's death  without noting or considering, *inter alia,* the record evidence of negligence by the anesthesiologist who improperly performed the intubation and without finding who was responsible for removing the breathing tube from Patient A's neck during the patient's second admission to the hospital and what the reason was for this removal, and without noting that this second admission, during which Patient A died, was under the authority and supervision of a doctor other than Dr. Vuyyuru.  In sum, that there was an intervening physician and intervening causes that were related to Patient A's treatment and death.

f)       The Board found Dr. Vuyyuru responsible for Patient B's near death complications, based on a blatantly inadequate investigation.  Neither the Attorney General's office, the Board's investigators, the Board's expert

23

Damle, or the Board members themselves made sufficient inquiries to find

the material medical records.  This material evidence discovered by Dr.

Vuyyuru after his hearing and showed that prior to and/or after the

procedure someone other than Dr. Vuyyuru had administered an

excessive dose of sedation medication to Patient B beyond the dose

prescribed by Dr. Vuyyuru. This material evidence also showed that

someone other than Dr. Vuyyuru failed following the procedure to

administer the antidote medication to counter the sedation medication

(which had been over-dosed). These records and the material facts they

reflect show, *inter alia,* that one or more witnesses intentionally concealed

material facts during their testimony at the revocation hearing, and that

Patient B's complications were the result of improper actions of persons,

either intentionally or negligently, other than Dr. Vuyyuru.  These improper

actions by other parties for whatever motive might have killed Patient B

except for Dr. Vuyyuru's heroic efforts to resuscitate her.  As with Patient A,

there were intervening physicians and causes for Patient B's life threatening

complications.

g)     The Board stated that Patient B left the hospital in a vegetative state, but

failed to note facts known to the Board at the time of its revocation decision

that Patient B had substantially improved after release and was no longer

in a vegetative state.

h)     The Board decision failed to address the legality of the search by Board

investigators of Dr. Vuyyuru's office without a warrant or subpoena.

i)     The Board decision failed to address the issue of the request by Dr.

24

Vuyyuru's counsel that one or more members of the Board's staff, including Director Harp, be recused/sequestered from the proceedings and deliberations due to bias or conflict of interest.

76.     In September of 2006, Dr. Damle and investigator Hardy gave testimony in depositions in a separate litigation after Dr. Vuyyuru's revocation hearing which made clear that Dr. Damle had given knowingly false testimony on several material points during Dr. Vuyyuru's revocation hearing including the following:

a)      Dr. Damle's testimony in his deposition made clear that he had given false testimony regarding his qualifications in the area of conducting ERCP procedures. Endoscopic retrograde cholangiopancreatography (ERCP) is a procedure used to identify stones, tumors, or narrowing in the bile ducts. The procedure is done through an endoscope. Dr. Damle led the Board to believe at the revocation hearing that he likely exceeded the standard set by the professional association of gastroenterologists that requires doctors to have conducted 50 ERCP procedures annually. Dr. Damle admitted that he had done 25 or fewer ERCP procedures for the several years preceding the revocation hearing. Had he testified truthfully at the revocation hearing, Dr. Damle would not have been qualified as an expert in Dr. Vuyyuru's area of medical practice.

b)      In addition, Dr. Damle testified falsely at the hearing that he had had no communications with the Board's investigators regarding the substance of the investigator's findings. This testimony was shown to be false by evidence acquired by Dr. Vuyyuru after the revocation hearing including

the September 2006 deposition of investigator Ann Hardy as well as communication from John Stanwix directing deletion of the record reference to this synopsis; both of which confirmed that Ms. Hardy had provided Dr. Damle with a verbal report summarizing the findings of the investigators related to the medical records of Patient A and Patient B. Stanwix had ordered any reference to this communication to be deleted from the administrative record prior to serving Dr. Vuyyuru with this record and filing of the record with the Board.

c)      Dr. Damle's deposition also exposed the fact that, when he went into the witness room during the revocation hearing on direction from the chairman to review the 1974 pages of records for Patients E-L, he did not actually review those records but only a portion of the records regarding just one of those patients. In his testimony during the revocation hearing Dr. Damle testified falsely that he reviewed all of the records.

77.      The records discovered by Dr. Vuyyuru post-hearing regarding Patient B, showed an overdose of sedation (pre and apparently post-procedure) by someone other than Dr. Vuyyuru followed by a post-procedure failure, again by someone other than Dr. Vuyyuru, to administer the antidote.  When taken together with the testimony that resuscitation equipment had been removed from the emergency cart brought in when this patient went into distress, this improbable series of failures and negligence is evidence that misconduct other than that alleged against Dr. Vuyyuru was involved in the treatment of Patient B.

26

78.    The statistical probability of the sequence of events happening consisting

of (1) an overdose of sedation anesthetic, (2) failure to administer post-procedure

antidote [that is done as a matter of routine procedure for patients who have undergone

anesthesia?] and (3) the removal of emergency resuscitation equipment from a cart that

is suppose to have such equipment as a matter of standing hospital protocol are so low

as to be evidence of gross negligence at best and intentional misconduct at worst.

79.    None of the breach of duties described in the preceding allegation were the

duty of Dr. Vuyyuru.

80.    That for the purpose of executing and/or attempting to execute the above

described schemes to deprive Dr. Vuyyur of his license to practice medicine, these

defendants, principals, aiders and abetters and individuals, also in violation of 18 U.S.C.

§ 1341 and § 1343, placed in post offices and/or in authorized repositories matter and

things to be sent or delivered by the Postal Service, caused matter and things to be

delivered by commercial interstate carrier, and received matter and things from the

Postal Service or commercial interstate carriers, transmitted and received by wire,

matter and things which include but are not limited to agreements, correspondence,

patient names, payments, reports, data, summaries, statements and plan materials.

### COUNT I
### STATUTORY BUSINESS CONSPIRACY
### VIRGINIA CODE § 18.2-499

81.    Plaintiffs repeats and realleges the allegations contained in paragraphs 1

through 80, inclusive, as though fully set herein.

82.     Upon information and belief, the defendants, by virtue of the conduct described herein, procured the participation, cooperation, agreement, or other assistance of one or more persons to enter into combination, association, agreement, and/or mutual understanding for the purpose of willfully and maliciously injuring plaintiffs in their reputation, trade business, or profession.

83.     Upon information and belief, defendants undertook these actions with full knowledge, intentionally, purposefully, willfully, maliciously, and without lawful justification.

84.     By virtue of defendants' conspiracy in violation of sections 18.2-499(A) and 18.2-500 of the Virginia Code, plaintiffs have suffered injury to their trade, business, profession, and reputation, including lost past and future fees in connection with the provision of medical services.

**COUNT II**
**MALICIOUS PROSECUTION**

85.     Plaintiff Dr. Vuyyuru repeats and realleges the allegations contained in paragraphs 1 through 84, inclusive, as though fully set herein.

86.     That defendant SRMC filed a complaint against plaintiff Dr. Vuyyuru.

87.     That defendants Board of Medicine and Attorney General instituted and continue original proceedings of a judicial nature against plaintiff Dr. Vuyyuru based on the complaint of SRMC.

88.     That the underlying judgment against plaintiff Dr. Vuyyuru was obtained by means of fraud on the court.  The Board and Attorney General (1) did not make a fair representation of the facts, (2) suborned perjury, and (3) denied plaintiff due process in presenting his case.

89.     Said proceedings were instituted with malice and improper purpose.

90.     Defendant SRMC initiated a complaint knowing that the claim was not valid, began proceedings based on hostility toward plaintiff Dr. Vuyyuru in retaliation for his whistleblowing activities and reporting of misconduct as he was required by law to do, and maintained such proceedings solely for the purpose of depriving Dr. Vuyyuru of his license to practice medicine.

91.     Defendants Board initiated and continued proceedings knowing that the claim was not valid and maintained such proceedings solely for the purpose of depriving Dr. Vuyyuru of his license to practice medicine.

92.     Defendant Attorney General presented said complaint knowing that the claim was not valid, began proceedings based on hostility toward plaintiff Dr. Vuyyuru in retaliation for his testimony as a witness in grand jury proceedings and investigation of the Attorney General's office and maintained such proceedings solely for the purpose of depriving Dr. Vuyyuru of his license to practice medicine.

93.     Defendants lacked probable cause for instituting said proceedings. In fact, defendants instituted proceedings based on 22 alleged cases ultimately dismissing the majority and depriving plaintiff of his license for the 2 most serious outcomes both of which he was not the last treating physician or physician responsible for the alleged failure of care.

94.     That defendants succeeded in depriving plaintiff of his license to practice medicine for which he has suffered injury.

## COUNT III
## ABUSE OF PROCESS

95.     Plaintiff Dr. Vuyyuru repeats and realleges the allegations contained in paragraphs 1 through 94, inclusive, as though fully set herein.

96.     Those defendants SRMC and JRMC filed complaints against plaintiff Dr. Vuyyuru.

97.     Those defendants Board of Medicine and Attorney General instituted and continue original proceedings of a judicial nature against plaintiff Dr. Vuyyuru based on the complaint of SRMC and JRMC.

98.     That defendants Board of Medicine and Attorney General conducted an search that was illegal and without a warrant against Dr. Vuyyuru.

99.     That defendants Board of Medicine and Attorney General confiscated records belonging to Dr. Vuyyru without legal authority and justification.

100.    That as a result of defendants' abuse of process and retaliation, plaintiff's license to practice medicine was taken without justification.

## COUNT IV
## THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1983

101.    Paragraphs 1 through 100 of this complaint are hereby incorporated by reference.

102.    Defendants under the color of law, subjected plaintiff to be deprived of rights belonging to him , in violation of The Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

103.    The actions of defendant described above constitute a violation of 42 U.S.C. § 1983 as amended.

104.    By reason of defendant's violation, plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 1983, as amended.

<u>COUNT V</u>
<u>THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1985(2)</u>

105.    Paragraphs 1 through 104 of this complaint are hereby incorporated by reference.

106.        Defendants engaged in a conspiracy to prevent or deter testimony of plaintiff by force or intimidation in violation of The Civil Rights Act of 1866, 42 U.S.C. § 1985(2), as amended, resulting in injury to the plaintiff.

107.    By reason of defendant's violation, plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 1985(2), as amended.

<u>COUNT VI</u>
<u>RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)</u>
<u>UNITED STATES CODE TITLE 18 SECTIONS § 1962(a), (b), (c), (d)</u>

108.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 107, inclusive, as though fully set herein.

109.    Plaintiff Dr. Vuyyuru is a "person" within the meaning of 18 U.S.C. § 1961(3).

110.    Plaintiff Virginia Times is a "person" within the meaning of 18 U.S.C. § 1961(3).

111.    Based upon plaintiffs' current knowledge, defendants SRMC and physicians constitute a group of individuals associated in fact as an enterprise.

112.    That defendants Board of Medicine and Attorney General aided and abetted defendants SRMC and physicians and, thus, became part of the enterprise.

113.    Defendants Board and Attorney General knew of the violations of defendants SRMC and physicians and their goal of retaliating against Dr. Vuyyuru and substantially assisted them in achieving said objective.

31

114.    Defendants conspired in their goal of retaliating against the Virginia Times for publishing information exposing fraud and misconduct.

115.    Furthermore, defendant Attorney General knew at all times during the proceedings that the Virginia Attorney General's office was the subject of a federal investigation and state grand jury proceedings.

116.    While the defendants participate in and are members of and part of the enterprise, they also have an existence separate and distinct from the enterprise.

117.    In order to successfully engage in fraud and misconduct for which defendants SRMC, JRMC and physicians profited, defendants needed to deprive Dr. Vuyyuru of his license and credibility as a witness.

118.    In order to successfully engage in fraud and misconduct for which defendants SRMC, JRMC and physicians profited, defendants needed to stop the Virginia Times from publishing.

119.    Defendants shared and disseminated information, met ex parte, and conspired to deprive Dr. Vuyyuru of his license to practice medicine.

## PREDICATE ACTS

120.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1513 (retaliating against a federal witness). As set forth in this complaint, all defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme.

121.    In addition, in order to make their scheme effective, each of the defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. §2. As a result, their conduct is indictable under 18 U.S.C. §§ 1341, 1343 and 1513.

## RICO VIOLATIONS
### § 1962(a)

**122.**    Section 1962(a) of RICO provides that "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principal within the meaning of § 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

**123.**    As set forth above, Defendants receive income from their participation as principals, aiders and abetters in an extensive pattern of racketeering activity.

124.    That income is reinvested to finance future racketeering activity, and the future operation of SRMC, JRMC and the business of defendant physicians.

## RICO VIOLATIONS
### § 1962(b)

125.    Section 1962(b) of RICO provides that it "shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

126.    Defendants took money from their racketeering violations of medical billing fraud and patient fraud and invested the money in their enterprises including the hospitals and their individual medical practices and private businesses.

127.    Defendants violated section 1962(b) by depriving plaintiff of his medical license in Virginia thus affecting his ability to practice in other states where he is licensed.

128.    Through the activities described above, defendants have affected interstate of foreign commerce.

## RICO VIOLATIONS
### § 1962(c)

129.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ... "

130.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the enterprise.

## RICO VIOLATIONS
### § 1962(d)

131.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section."

132.    Defendants' conspiracy to secure money by retaliating against the plaintiff and depriving him of his license through the fraudulent scheme described above violates 18 U .S.C. § 1962(d).

133.   Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud and retaliation against a federal witness, and each defendant so participated in violation of 18 U.S.C. § 1962(c).

134.   Each Defendant further agreed to use or invest, directly or indirectly, part of the income derived from their acts of mail fraud and wire fraud, which constituted a pattern of racketeering activity, in the establishment, operation and expansion of the enterprise, and has done so in violation of 18 U.S.C. § 1962(a).

### INJURY

135.   Plaintiff Dr. Vuyyuru has been injured due to the loss of his license and business incurred in connection with the defendants' violations of Virginia and United States law and cause by said violations.

136.   Plaintiff Virginia Times has been injured due to the loss of business incurred in connection with the defendants' violations of Virginia and United States law and caused by said violations.

### JURY DEMAND

Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rules of Civil Procedure 38, a trial by jury of the claims asserted in this Complaint.

WHEREFORE, plaintiffs, respectfully pray that the Court:

a.   Enter judgment in their favor and against defendant for all legal and equitable relief available

b.    For damages resulting from defendant's violations of Virginia and United States law.

c.    Prejudgment and postjudgment interest.

d.    Order defendant to pay punitive damages in an amount to be determined at trial;

e.    Order defendant to pay his attorney's fees, costs, expenses, disbursements, and expert witness fees and

f.    Grant such other and further relief as the Court deems appropriate.


Respectfully submitted,
LOKESH VUYYURU, MD
THE VIRGINIA TIMES


By: _____
Of Counsel


_____
STEVEN D. SMITH
SD Smith, Esquire, PLLC
Co-Counsel for plaintiff
VSB No. 73624
2001 S. Main St., Suite 207-F
Blacksburg, VA 24060
(540) 552-2525  telephone
(540) 526-9413  facsimile